IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:23-CV-434 |
| MARSHALL E. MELTON and INTEGRATED CONSULTING & MANAGEMENT, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

The Securities and Exchange Commission has sued Marshall Melton and Integrated Consulting & Management, LLC for violating the Securities Act and the Exchange Act in connection with the defendants' solicitation of funds for a project to redevelop buildings in downtown Laurinburg, North Carolina. The SEC moved for summary judgment. The Court, finding that there were no disputed questions of material fact as to liability, granted the motion, Doc. 48, and enters this supplemental order to provide a more detailed explanation of its decision.

### I.    Summary Judgment

The SEC, as the movant for summary judgment, has the initial burden to show there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). If the moving party meets its initial burden, then the non-moving parties, here Mr. Melton and ICM, must come forward with evidentiary material that demonstrates the existence of a genuine

issue of material fact requiring a trial. *Bandy v. City of Salem*, 59 F.4th 705, 709–10 (4th Cir. 2023); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy*, 59 F.4th at 709. A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of a scintilla of evidence in favor of the non-movant's position is insufficient to withstand [a] summary judgment motion." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (cleaned up).

## II.    Overview of Undisputed Facts

Many of the facts are undisputed, and the Court otherwise views the evidence in the light most favorable to the defendants, the non-moving parties.[1] An overview is provided here. Other facts will be discussed in the context of the issues.

### A.  Mr. Melton's History of Securities Fraud

Almost three decades ago, the SEC sued Mr. Melton and several companies he controlled over a number of false statements he made to induce clients to invest; the SEC

---

[1] The Court has not scoured the record for evidence; it has relied on the parties to direct its attention to evidence through citations in the briefing, as required by the Local Rules and court order. LR 56.1(d); Doc. 23 at ¶ 1; *see also Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) ("[A] court is not required to scour the record in search of evidence to defeat a motion for summary judgment." (cleaned up)); *Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 395–96 (4th Cir. 1994) (holding that the district court was "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate").

asserted six claims under the Securities Act, the Exchange Act, and the Investment Advisers Act. Doc. 37-93 at ¶¶ 120–41. In 1998, he agreed to a permanent injunction, Doc. 37-94 at ¶ 1, in which this Court ordered him to refrain from engaging in conduct that violated § 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Doc. 37-95 at 3, and Mr. Melton agreed to disgorge the income he received from the illegal scheme alleged in the complaint. Doc. 37-94 at ¶ 8; *see also* Doc. 37-95 at 6–7.

In 1997, Mr. Melton was indicted on state charges arising from the same conduct. Doc. 37-96 at 11. In 2002, he was convicted of multiple counts of solicitation to commit securities fraud. *Id.* at 7. He received a suspended sentence and was placed on supervised probation for five years. *Id.* at 8. As conditions of probation, Mr. Melton was required to surrender his license for the purchase or sale of securities, not seek to be licensed to purchase or sell securities, and not engage in the sale of securities, except for himself or members of his family. *Id.*

In 2003, the SEC barred Mr. Melton from associating with certain members of the securities industry. Doc. 37-97 at 11. It also revoked the registration of the investment adviser he controlled. *Id.*

**B. The Laurinburg Project**

In 2014, Mr. Melton established Integrated Consulting & Management, LLC. *See* Doc. 37-76 at ¶ 4. Between 2016 and 2021, Mr. Melton and ICM solicited and received funds from seven clients—Diane and Fred Sisley, James Tyson, David and Marjorie Walker, Helen Bates, and Jesse Flanders—to use for a project he referred to as the

3

"Laurinburg Project." *See id.* at ¶ 9; Doc. 37-91 at 35–36;[2] *see also* Doc. 37-31 (promissory note signed by Mr. Melton as member-manager of ICM). Mr. Melton told six of the clients that he would use the money to buy properties in downtown Laurinburg, North Carolina, and renovate them for rental income and resale. Doc. 37-3 at ¶ 10 (Ms. Sisley); Doc. 37-11 at ¶ 10 (Mr. Sisley); Doc. 37-19 at ¶ 6 (Mr. Flanders); Doc. 37-26 at ¶¶ 10–11 (Mr. Tyson); Doc. 37-32 at ¶ 19 (Mr. Walker); Doc. 37-54 at ¶ 19 (Ms. Walker). The evidence strongly supports the inference that he told Ms. Bates much the same, *see* Doc. 37-91 at 35–36, and Mr. Melton has pointed to no contrary evidence.

Mr. Melton established a limited liability company, Laurinburg Partners, LLC. *See* Doc. 37-2 at 2–3; Doc. 37-4. ICM was the "Sole Initial Class A Membership Unit Owner" of Laurinburg Partners, and Mr. Melton was the sole manager of ICM. *See* Doc. 37-4 at 34. The money received from investors in the Laurinburg Project flowed through ICM. Doc. 37-91 at 38–39; *see also* Doc. 37-7 at 2; Doc. 37-15 at 2.

Mr. Melton provided most of the clients with documents that identified the properties the LLC would buy and detailed the plans to renovate them. Doc. 37-99 at 12–13; *see also* Doc. 37-6 (Ms. Sisley); Doc. 37-14 (Mr. Sisley); Doc. 37-20 (Mr. Flanders); Doc. 37-52 (Mr. Walker); Doc. 37-74 (Ms. Walker). These documents contained renderings of how the buildings would look after renovation and projections of cost, cash flow, capital appreciation, and income for the Laurinburg Project. *See, e.g.*, Doc. 37-6. Mr. Melton documented transactions for some of the clients in promissory notes,

---

[2] The Court has used the pagination appended by the CM/ECF system for this and other deposition cites, not the internal pagination.

4

operating agreements of Laurinburg Partners, and subscription agreements. *See, e.g.*, Doc 37-4 (operating agreement for Ms. Sisley); Doc. 37-17 (ICM promissory note for Mr. Sisley); Docs. 37-28, 37-29 (same for Mr. Tyson); Doc. 37-5 at 11–15 (subscription agreement for Ms. Sisley); Doc. 37-23 at 11–15 (same for Mr. Flanders).

During his solicitations, Mr. Melton did not tell the clients that a court had enjoined him from violating § 17(a) of the Securities Act, that he had to disgorge funds in connection with a securities fraud case, that he had been convicted of securities fraud, or anything else about his securities disciplinary and criminal history. Doc. 37-3 at ¶ 21; Doc. 37-11 at ¶ 21; Doc. 37-19 at ¶ 22; Doc. 37-26 at ¶ 19; Doc. 37-32 at ¶ 26; Doc. 37-54 at ¶ 26.

Between March 2016 and August 2019, ICM deposited $1,342,565.66 into its bank account. Doc. 37-76 at ¶ 10. All but $76,070.77 came from these seven clients. *Id.* at ¶ 45; Doc. 37-77 at 3. Over that same time period, Mr. Melton withdrew or caused to be spent $1,334,830.68 from the ICM bank account. Doc. 37-76 at ¶ 10; Doc. 37-77 at 3.

Of those funds, the defendants paid $112,677.73[3] for Mr. Melton's personal credit card bills. Doc. 37-76 at ¶¶ 19–23; Doc. 37-99 at 56, 78, 90–91, 98, 103 (Mr. Melton acknowledging that all but one of those credit card accounts were in his personal name); *see also* Doc. 37-77 at 3. They paid $90,893.37 in legal fees for services unrelated to the Laurinburg Project, including litigation related to one of Mr. Melton's prior business ventures, his divorce, and a speeding ticket. Doc. 37-76 at ¶ 41; *see also* Doc. 37-99 at

---

[3] The defendants transferred an additional $5,227.85 to a business credit card for Signature Wealth Management, a separate business from ICM or Laurinburg Partners. Doc. 37-76 at ¶ 20.

5

123–29.  The defendants also used $3,956.20 of ICM's funds for rent for Mr. Melton's daughter's apartment, Doc. 37-76 at ¶ 43; *see also* Doc. 37-99 at 135 (Mr. Melton's testimony that this expense was unrelated to Laurinburg Project), $9,199.72 for beauty and fashion expenses, Doc. 37-76 at ¶ 28; *see also* Doc. 37-99 at 47–51 (Mr. Melton's testimony that many of these expenses were for him), and $946.95 for a donation to Joel Osteen.  Doc. 37-76 at ¶ 32; *see also* Doc. 37-99 at 107 (Mr. Melton's testimony that this donation was unrelated to Laurinburg Project).  He used at least $27,500.33 to pay off debts for other clients who had previously been involved in dealings with Mr. Melton, Doc. 37-76 at ¶¶ 39–40; Doc. 37-99 at 121–22, and $34,424.90 in health expenses, much of which was for testosterone and other supplements for himself.  Doc. 37-76 at ¶ 42; Doc. 37-99 at 131–32.  And he paid $44,048.78 in office rent for Signature Wealth Management, a separate business.  Doc. 37-76 at ¶¶ 20, 43.

As of August 12, 2019, ICM's bank account had a balance of $39.28.  *Id.* at ¶ 14. Neither Mr. Melton nor ICM have repaid the money they received from most of the clients, nor have the clients received any profits.[4]  Doc. 37-3 at ¶ 25; Doc. 37-11 at ¶ 25; Doc. 37-19 at ¶ 24; Doc. 37-26 at ¶¶ 22, 26.

## III.    Outline of Claims

The SEC brings three causes of action against Mr. Melton and ICM.  In Count I, the SEC asserts that the defendants violated § 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).  Doc. 1 at ¶¶ 83–86.  In Count II, the SEC asserts that the defendants

---

[4] The defendants have proffered some evidence that they paid back the Walkers in full.  *See* Doc. 37-91 at 45.

violated § 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (a)(3). Doc. 1 at ¶¶ 87–90. And in Count III, the SEC asserts that the defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5(a), (b), and (c). Doc. 1 at ¶¶ 91–94.[5]

All three causes of action require the SEC to establish a nexus to interstate commerce. *SEC v. Staples*, 55 F. Supp. 3d 831, 837 (D.S.C. 2014); *SEC v. Causwave, Inc.*, No. 15-CV-1068, 2018 WL 4625407, at *3–4 (M.D.N.C. Sept. 26, 2018). For each claim, the SEC must also show a false statement or omission of material fact by Mr. Melton and ICM. *SEC v. Peters*, No. 17-CV-630, 2021 WL 1112387, at *5 (E.D.N.C. Mar. 22, 2021). As to the § 17(a) claims in Counts I and II, the false statement or omission must be in the offer or sale of securities, 15 U.S.C. § 77q(a); *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014), and as to the § 10(b) claim in Count III, it must be in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); *Monterosso*, 756 F.3d at 1333.

For the § 17(a)(1) claim in Count I and the § 10(b) claim in Count III, the SEC must also show that the defendants made the false statement or omission with scienter. *Aaron v. SEC*, 446 U.S. 680, 695–97 (1980); *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 239 (4th Cir. 2009). For the § 17(a)(2) and (a)(3) claims in Count II, the SEC need only show negligence, not scienter. *Aaron*, 446 U.S. at 697; *Peters*, 2021 WL 1112387, at *5.

In summary:

---

[5] As seems to be the practice, the Court will refer to the section numbers in the Securities Act and the Exchange Act rather than the section numbers as codified in the United States Code.

| Count I – § 17(a)(1) | Interstate Commerce | False statement or omission of material fact | I/C/W offer or sale of securities | Scienter |
|---|---|---|---|---|
| Count II – § 17(a)(2) and (a)(3) | Interstate Commerce | False statement or omission of material fact | I/C/W offer or sale of securities | Negligence |
| Count III – § 10(b) | Interstate Commerce | False statement or omission of material fact | I/C/W purchase or sale of securities | Scienter |

## IV. Liability

### A. Interstate Commerce (Counts I, II, and III)

The SEC has offered undisputed evidence of interstate commerce. *See generally* Docs. 37-76, 37-77. Mr. Melton and ICM have not disputed this element.

### B. Material Misrepresentations and Omissions (Counts I, II, and III)

A claim under § 17(a), § 10(b), and Rule 10b–5 requires a showing that the defendant made a material misrepresentation or omission. *Pirate Inv.*, 580 F.3d at 240; *Peters*, 2021 WL 1112387, at *5. To prevail, the SEC must show "that the defendant acted deceptively" or "that the defendant engaged in deceptive acts such as misstatements and omissions by those with a duty to disclose." *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018) (cleaned up).

The SEC identifies the following misrepresentations and omissions:

-- Mr. Melton told clients "that their funds would be used for the Laurinburg Project when, in fact he used a majority of their money for personal expenses." Doc. 38 at 22.

8

-- Mr. Melton falsely told some clients "that they could recoup the money lost on prior investments with him by investing in the Laurinburg Project." *Id.* at 22–23.

-- Mr. Melton "misrepresented to the Sisleys that Diane Sisley needed to assign her membership units in Laurinburg Partners to him so he could 'sell them for her and get her something better,'" when he actually "assigned them to the Walkers to settle their claims against him." *Id.* at 23.

-- Mr. Melton's fiduciary relationship with the Sisleys, the Walkers, and Mr. Tyson, as well as his representation to Mr. Flanders that he was a successful real estate investor, triggered an obligation for Mr. Melton to disclose his securities disciplinary history, which he did not do. *Id.* at 23–24.

### 1. Materiality

The misstatement or omission must concern a material fact. *Singer*, 883 F.3d at 439. "A fact is material 'if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.'" *Causwave, Inc.*, 2018 WL 4625407, at *4 (quoting *Pirate Inv.*, 580 F.3d at 240).

The SEC has offered undisputed evidence of materiality. The defendants do not directly dispute materiality as to any of the statements or omissions that the SEC asserts are material. *See* Doc. 41 at 11–16. An indirect argument that the omission of Mr. Melton's convictions was not material will be discussed *infra*.

9

## 2. False Statements and Omissions

To qualify as a misrepresentation, a statement must have been "demonstrable as being true or false" and inaccurate when it was made. *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004); *see also Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004). "Pure omissions are not actionable under Rule 10b–5(b)," *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 266 (2024), but an omission of material fact by a party with a duty to disclose the fact can be actionable under Rule 10b–5(a) or (c). *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). A party has a duty to disclose if there is a "fiduciary or other similar relation of trust and confidence between" the parties. *Chiarella v. United States*, 445 U.S. 222, 228 (1980).

### a. Representations About Use of Clients' Funds

It is undisputed that when Mr. Melton spoke with the Sisleys, the Walkers, Mr. Tyson, and Mr. Flanders about the investment opportunity, he told them that their money would go toward buying and renovating buildings in Laurinburg. Doc. 37-3 at ¶ 10; Doc. 37-11 at ¶ 10; Doc. 37-19 at ¶ 6; Doc. 37-26 at ¶¶ 10–11; Doc. 37-32 at ¶¶ 19–21; Doc. 37-54 at ¶¶ 19–21. It is also reasonable to infer, and the defendants do not dispute, that Mr. Melton told Ms. Bates that her money for ICM would go to the Laurinburg Project. *See* Doc. 37-91 at 41, 53. The operating agreement that the defendants provided to Ms. Sisley stated that invested funds would be used "solely for the business of the Company." Doc. 37-4 at p. 13 ¶ 6.1.2. And in the promissory notes the defendants provided to Mr. Sisley, Doc. 37-17, and Mr. Tyson, Docs. 37-28, 37-29, 37-30, the defendants represented

10

that the notes were "issued in payment funds for use in general business purposes, including both direct and indirect costs, in furtherance of the redevelopment projects in Laurinburg, North Carolina." *See, e.g.*, Doc. 37-17 at ¶ 2.

The SEC has offered undisputed evidence that these statements were false when made. *See* Doc. 37-77. The evidence shows that soon after Mr. Melton represented that he and ICM would use the money for the Laurinburg Project, the defendants almost immediately used large amounts of the money for non-Laurinburg Project purposes. *See, e.g.*, *id.* at 17–19. The close temporal proximity between Mr. Melton's solicitations of funds for the project and his use of large chunks of ICM funds for personal expenses gives rise to an unrebutted inference that these statements were untrue when made.

For example, after Mr. Flanders contributed nearly $53,000 to the Laurinburg Project, the defendants used only $2,111.63 for "Potential Real Estate Activity."[6] *Id.* at 27. Instead, the defendants quickly transferred $12,000 to Mr. Melton's personal account, paid $3,193 in credit card bills, used $6,550 to pay off other clients, spent $20,600 on non-Laurinburg legal fees, and more on other non-Laurinburg expenses. *Id.* As another example, immediately after Mr. Tyson contributed $10,000 in December 2016, the defendants spent $2,007 on credit card bills and $5,070.63 on beauty and clothing items, among other non-Laurinburg expenses; they only spent $4,029.36 on "Potential Real Estate Activity." *Id.* at 17.

---

[6] The SEC's forensic accountant uses the term "Potential Real Estate Activity" to include expenses purportedly related to the Laurinburg Project including legal fees, real estate agent expenses, payroll costs, and construction costs. *See* Doc. 37-77 at 13.

Mr. Melton has admitted that he used money in ICM's account for expenses unrelated to the Laurinburg Project, including wine, toys, insurance, groceries, liquor, trips to Las Vegas, testosterone, legal expenses, and rent for his daughter's apartment. Doc. 37-99 at 109–14, 120, 123–24, 126–28, 131–32, 135; Doc. 37-76 at ¶¶ 33–35, 37, 41–43. Some of the money went to pay Mr. Melton's debts on previous projects. Doc. 37-99 at 121–22. And it is undisputed that some of the money came in and went "directly" to paying expenses unrelated to the Project. Doc. 37-76 at ¶ 40. The defendants also transferred hundreds of thousands of dollars to Mr. Melton's personal bank accounts. *Id.* at ¶ 16. There is no evidence that Mr. Melton told any of the clients that their money would be used for his personal expenses, like legal fees for his divorce or to pay his credit card bills.

The defendants contend that because the SEC has not presented direct evidence that the statements were untrue at the time they were made, a rational trier of fact could conclude that they were not. Doc. 41 at 12–13. But parties are not required to present direct evidence to obtain summary judgment; "circumstantial evidence is treated no differently than direct evidence." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 764 (4th Cir. 2021) (quoting *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989)). The defendants do not point to any testimony by Mr. Melton that the statements were true when made, nor have they pointed to evidence from which a reasonable jury could infer that the statements were true when made.

The defendants also mischaracterize how the SEC defines the misrepresentations. First, according to the defendants, the SEC contends that Mr. Melton's "statement of

12

intent to purchase properties in downtown Laurinburg is a misrepresentation." Doc. 41 at 11. Second, according to the defendants, the SEC contends that the defendants "made a misrepresentation by stating that all funds received would be used for the purchase and renovation of the Laurinburg properties." *Id.* The defendants say that since Mr. Melton testified that he bought properties in Laurinburg and that he hired a project manager, there is a material dispute of fact. *Id.* (citing Doc. 37-91 at 37–38; Doc. 37-99 at 10).

But the SEC's contentions are much narrower than the defendants claim. The SEC asserts that the defendants misrepresented material facts when Mr. Melton falsely told the clients "that their funds would be used for the Laurinburg Project when, in fact he used a majority of their money for personal expenses." Doc. 38 at 22. As discussed *supra*, the undisputed evidence shows that at the time Mr. Melton told his clients that the money would be used for the Laurinburg Project, he in fact intended to use large amounts of the money received for his personal benefit. There is no evidence that any of these clients were on notice that Mr. Melton would use so much of the money on his personal needs, not on the Project.

Even if the defendants actually spent some of the funds on legitimate Laurinburg Project expenses, and even if they raise disputed questions of fact about whether some of the expenses were legitimately related to the Laurinburg Project, the defendants have not shown a material dispute of fact. Given the scope of the scam and the relatively small amounts Mr. Melton claims were business-related, these disputes are not material to liability. The defendants do not dispute the evidence presented by the SEC of how the money was spent, and no reasonable jury could find that the clients were on notice that

13

Mr. Melton would personally receive so much of the money, all out of proportion to money even arguably spent on the project. *See SEC v. Perkins*, No. 19-CV-243, 2022 WL 4703335, at *9 (E.D.N.C. Sept. 30, 2022). And no reasonable jury could conclude that any of the representations put the clients on notice that their money would go to Mr. Melton's other LLCs for old debts and legal fees, especially in such large amounts. *See* Doc. 37-76 at ¶¶ 39–41, 43. Questions about the exact amount of funds the defendants used for non-Laurinburg expenses can be resolved during the remedies stage, if they remain at issue.

### b. Representations About Recouping Money

Mr. Melton told Ms. Sisley and Mr. Tyson that they could recoup money lost in previous deals with Mr. Melton if they invested in the Laurinburg Project. Specifically, sometime around February 2017, Mr. Melton told Ms. Sisley that in addition to any cash she invested, he would credit her investment in the Laurinburg Project with the $60,000 she had lost in one of Mr. Melton's prior business ventures. Doc. 37-3 at ¶¶ 13-14. And sometime in late 2016 to April 2017, Mr. Melton told Mr. Tyson that in addition to the return Mr. Tyson would receive on his investment in the Laurinburg Project, Mr. Melton would credit him for the $250,000 he had previously invested and lost in two of Mr. Melton's prior deals. Doc. 37-26 at ¶¶ 12, 14.

Around when Mr. Melton made these statements, the defendants used much of the clients' funds for non-Laurinburg expenses. *See* Doc. 37-77 at 17–19 (showing well under half of the clients' funds going to "Potential Real Estate Activity" in early 2017). After Ms. Sisley contributed $23,500 for the Laurinburg Project in February 2017, Doc.

14

37-3 at ¶ 14, the defendants immediately transferred $15,700 to Mr. Melton's personal account and spent nearly $2,000 on credit card payments, $3,795.14 on medical expenses, $281.27 on grocery store and department store expenses, $208.09 on dining, and $72.99 on hotels; the defendants only spent $3,634.08 on "Potential Real Estate Activity." Doc. 37-77 at 19. And in December 2016 to January 2017, after Mr. Tyson contributed $10,000 for the Laurinburg Project, the defendants only used $4,029.36 for "Potential Real Estate Activity." *Id.* at 17. After Mr. Tyson transferred $40,000 to the defendants in January 2017, the defendants only spent only $2,911.14 on "Potential Real Estate Activity"; the defendants instead transferred $15,000 to Mr. Melton's personal account, spent $2,500 on credit card bills, paid an investor in a former project $5,333.33, and more. *Id.* at 18. This spending shows that these statements were misrepresentations as they were untrue when the defendants made them.

### c. Representations About Assigning Units

In April 2021, Mr. Melton told Ms. Sisley that she should assign her five membership units in Laurinburg Partners to him so he could "sell them for [her] and get [her] something better." Doc. 37-3 at ¶¶ 15, 18. After she did so, *id.* at ¶ 18; Doc. 37-10, Mr. Melton did not sell the units and invest the proceeds for Ms. Sisley; instead, he immediately assigned those units to the Walkers to settle claims they had against him. Doc. 37-32 at ¶ 30; Doc. 37-54 at ¶ 30; Doc. 37-99 at 142–43. The close proximity between when Mr. Melton made the representation to Ms. Sisley and when he assigned the units to the Walkers, on top of all the other evidence suggesting that he was not being honest with his clients, demonstrates that the statement was untrue at the time he made it.

15

There is no evidence that he planned to sell her units for her benefit, and all the evidence supports the inference that he needed those units to settle claims against him.

### d. Omissions

It is undisputed that Mr. Melton did not tell six clients about his securities disciplinary history, including that he had been convicted of securities fraud or that he was subject to an injunction that barred him from violating § 17(a) of the Securities Act. Doc. 37-3 at ¶ 21; Doc. 37-11 at ¶ 21; Doc. 37-19 at ¶ 22; Doc. 37-26 at ¶ 19; Doc. 37-32 at ¶ 26; Doc. 37-54 at ¶ 26.[7]  The SEC asserts that this was a material omission.  Mr. Melton contends that under *Macquarie*, 601 U.S. at 266, this "pure omission" does not subject him to liability.  Doc. 41 at 12.

In *Macquarie*, the Supreme Court held that under Rule 10b–5(b), an omission can only be actionable if the party makes an affirmative statement that would be misleading if the party did not state the omitted fact.  601 U.S. at 265.  But the Court limited its holding to subsection (b) of the rule.  *Id.  Macquarie* does not disturb the holding in *Affiliated Ute Citizens* that under Rule 10b–5(a) and (c), an omission can be actionable if the party has a duty to disclose the omitted information.  406 U.S. at 153.

Mr. Melton told Mr. Flanders "that he was a successful real estate investor" and "that he invested in movies and was well-versed in the stock market."  Doc. 37-19 at ¶ 4.  Mr. Melton's affirmative statements about his expertise created a duty to disclose the information about his disciplinary history.  That information was necessary to properly

---

[7] The SEC does not assert that this omission qualifies as a misrepresentation as to Ms. Bates.

contextualize his affirmative representation. Without the disclosure, the statements about his experience were misleading. *See, e.g.*, *SEC v. Merch. Cap.*, 483 F.3d 747, 770–71 (11th Cir. 2007) (holding that because the defendant touted his business experience, there was a duty to disclose other information that might cause an investor to question that experience).

Mr. Melton had a duty to disclose his disciplinary history to the Sisleys, Mr. Tyson, and the Walkers because of his longstanding financial advisory relationship with them. A party has a duty to disclose material facts when there is a "fiduciary or other similar relation of trust and confidence between" the parties. *Chiarella*, 445 U.S. at 228. It is undisputed that Mr. Melton had a longtime financial advisory relationship with these clients. Doc. 37-3 at ¶¶ 4–5 (Ms. Sisley); Doc. 37-11 at ¶¶ 4–5 (Mr. Sisley); Doc. 37-26 at ¶¶ 2–3 (Mr. Tyson); Doc. 37-32 at ¶¶ 3–4 (Mr. Walker); Doc. 37-54 at ¶¶ 3–4 (Ms. Walker). These clients had invested with him in other projects, *see, e.g.*, Doc. 37-3 at ¶ 9, and had paid him for his services as their financial advisor. *See, e.g.*, Doc. 37-54 at ¶ 3. This undisputed evidence shows that these clients had a relationship of trust with Mr. Melton, and that created an affirmative duty to disclose material facts, including that he had previously been disciplined for his conduct in the sale of securities.

As noted *supra*, the defendants do not directly dispute materiality. And information about Mr. Melton's prior criminal and civil securities disciplinary history would certainly influence a client's decision about whether or not to invest in the Laurinburg Project. *See* Doc. 37-3 at ¶ 21 (Ms. Sisley's testimony that they would not have provided money for the Laurinburg Project if they had known about Mr. Melton's

17

disciplinary history); Doc. 37-11 at ¶ 21 (same for Mr. Sisley); Doc. 37-19 at ¶ 22 (same for Mr. Flanders); Doc. 37-26 at ¶ 19 (same for Mr. Tyson); Doc. 37-32 at ¶ 26 (same for Mr. Walker); Doc. 37-54 at ¶ 26 (same for Ms. Walker); *see also SEC v. Prater*, 289 F. Supp. 2d 39, 52–53 (D. Conn. 2003) ("The failure to disclose . . . any information about [the defendant's] extensive criminal history . . . would certainly constitute a material omission which a reasonable investor might view as important in deciding whether to trust their money with [the defendant] or his company.").

The defendants contend that the omission is not actionable because some of the client relationships predate the disciplinary action. Doc. 41 at 12. But the defendants cite no authority suggesting that this eliminates Mr. Melton's duty to disclose his disciplinary and criminal history of securities fraud.

To the extent the defendants contend that Mr. Melton's failure to inform the clients about his 2002 plea in North Carolina state court is not a material omission because it was an *Alford* plea, *id.* at 2, that argument is unpersuasive. Mr. Melton stated at the time of his plea that he understood that even though he was entering an *Alford* plea, he would be treated as guilty of the conduct. Doc. 37-96 at 5. Further, under both North Carolina and federal law, an *Alford* plea counts as an adjudication of guilt and functions the same as a standard guilty plea. *See State v. Crawford*, 278 N.C. App. 104, 107, 861 S.E.2d 18, 22 (2021); *United States v. King*, 673 F.3d 274, 282 (4th Cir. 2012).

### e.  Summary

The SEC presented undisputed evidence that the defendants made material misrepresentations to all seven clients when Mr. Melton discussed the Laurinburg Project

18

with them and told them that their money would go towards buying and renovating properties in Laurinburg. The defendants made similar misrepresentations in the operating agreement they provided to Ms. Sisley and the promissory notes they provided to Mr. Sisley and Mr. Tyson.

The SEC presented undisputed evidence that the defendants made material misrepresentations to Ms. Sisley and Mr. Tyson about their ability to recoup money from past investments with Mr. Melton. And the SEC provided undisputed evidence that the defendants made a material misrepresentation to Ms. Sisley when Mr. Melton told her she needed to assign her membership units to him so he could sell them and get her something better.

Mr. Melton's undisputed omissions about his disciplinary and criminal history were material omissions as to Mr. Flanders because of his affirmative representation that he was a successful investor and as to the Sisleys, the Walkers, and Mr. Tyson because of his longtime role as their financial advisor.

### C. State of Mind

#### 1. Scienter (Counts I and III)

"[S]cienter refers to a mental state embracing intent to deceive, manipulate, or defraud," and "[t]he SEC meets its burden of proving scienter by establishing that the speaker acted intentionally or recklessly." *Pirate Inv.*, 580 F.3d at 241 (cleaned up). The SEC may establish scienter through circumstantial or direct evidence. *Monterosso*, 756 F.3d at 1335. If Mr. Melton acted with scienter, his scienter may be imputed to ICM because he was an authorized agent of ICM. *Causwave, Inc.*, 2018 WL 4625407, at *4.

19

The SEC has provided undisputed evidence that Mr. Melton made his misrepresentations intentionally or recklessly. He solicited funds from the clients by telling them in conversations and writings that he would use their money to buy and renovate properties in Laurinburg when, in fact, he intended to and did use much of the money to satisfy his personal debts and to pay for things with no connection to the Laurinburg Project. As money came in, he spent it on personal items and then went looking for more so he could continue to fund his personal expenses, not the Laurinburg Project, and on and on it went for several years. The short timeframe of this scheme presents compelling evidence of scienter.

The defendants have pointed to no evidence that Mr. Melton paid his personal and non-Laurinburg expenses out of carelessness or because of an accounting error. They have not pointed to any testimony by Mr. Melton that the statements were not made intentionally. Looking at the scheme as a whole, no reasonable jury could find that Mr. Melton did not act with scienter when he made the misrepresentations to the clients.

Likewise, no reasonable jury could conclude that Mr. Melton did not act with scienter when he failed to disclose his disciplinary history. *See Perkins*, 2022 WL 4703335 at *12 (holding that defendant acted with scienter in failing to disclose criminal history). Mr. Melton had knowledge of his disciplinary and criminal history, *see* Doc. 37-96 at 5–6 (Mr. Melton's signed plea agreement), and he acted with at least recklessness in failing to tell his clients about this important information. As to Mr. Flanders, Mr. Melton made affirmative representations about his expertise, Doc. 37-19 at ¶ 4, leaving out the obviously relevant fact that he had been convicted of securities fraud. And as to the other

20

five clients, the fact that Mr. Melton had close financial advisory relationships with them spanning decades, *e.g.*, Doc. 37-3 at ¶¶ 4–5, shows that he acted with at least recklessness in failing to disclose the information about his disciplinary history. All five of these clients invested multiple times over the course of this scheme, Doc. 37-77 at 2, so his omission was repeated. The length of these relationships and the many transactions involved also support a reasonable inference of scienter.

In opposition, the defendants make many of the same arguments they made in opposition to the misrepresentation element about use of funds. *See* Doc. 41 at 15–16. For the reasons stated *supra*, those arguments are unpersuasive. *See supra* at 12–14.

The defendants also assert that scienter "has a higher burden of proof" than the other elements. Doc. 41 at 16. But the Fourth Circuit has held that the SEC must establish scienter by a preponderance of the evidence. *Pirate Inv.*, 580 F.3d at 242. That standard is easily met here.

## 2. Negligence (Count II)

Mr. Melton does not dispute that the SEC has shown that he made all the statements at issue negligently and that his omission of his disciplinary history was negligent. *See* Doc. 41 at 15–16 (only disputing scienter). Since the SEC has provided undisputed evidence of scienter, it has also shown at least negligence as to those clients for a claim under § 17(a)(2) and (3).

## D. Offer, Sale, or Purchase of Securities

The SEC establishes the "in connection with" requirement when it shows that the fraudulent activity "touches or coincides with a securities transaction." *Pirate Inv.*, 580

21

F.3d at 244 (cleaned up). Courts evaluate: "(1) whether a securities sale was necessary to the completion of the fraudulent scheme; (2) whether the parties' relationship was such that it would necessarily involve trading in securities; (3) whether the defendant intended to induce a securities transaction; and (4) whether material misrepresentations were disseminated to the public in a medium upon which a reasonable investor would rely." *Id.* (cleaned up).

The defendants contend that many of the transactions did not involve the offer, sale, or purchase of securities. Doc. 41 at 13–15.

### 1. Investment Contracts

Investment contracts are securities pursuant to the Securities Act. *Abanda v. OurBloc LLC*, No. 23-CV-1071, 2024 WL 3995139, at *5 (D. Md. Aug. 29, 2024) (citing 15 U.S.C. § 77b(a)(1)). Using the factors from *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), an investment contract exists when "a person (1) invests his money (2) in a common enterprise (3) and is led to expect profits solely from the efforts of the promoter or a third party." *Abanda*, 2024 WL 3995139, at *5 (cleaned up) (quoting *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 920 (4th Cir. 1990)).

Here, Mr. Melton's clients contributed funds to the Laurinburg Project in exchange for future profits; these transactions constitute investment contracts. The evidence shows, and the defendants do not dispute, that each client invested their money in a common enterprise to redevelop properties in downtown Laurinburg. *See generally* Docs. 37-76, 37-77 (showing a pooling of funds in the ICM account).

The defendants only contest the third *Howey* factor: whether the defendants led the clients "to expect profits solely from the efforts of the promoter or a third party." *Abanda*, 2024 WL 3995139, at *5; Doc. 41 at 13. But they offer no evidence to rebut the evidence presented by the SEC.

### a. The Walkers

The Walkers collectively transferred well over half a million dollars to Mr. Melton and ICM for the Laurinburg Project. Doc. 37-32 at ¶ 23; Doc. 37-54 at ¶ 23; Doc. 37-77 at 2. Mr. Melton told the Walkers that he would repay them with 5% interest to be paid from the revenues from the Project. Doc. 37-32 at ¶ 21; Doc. 37-54 at ¶ 21. Mr. Melton told the Walkers "that he would handle everything associated with the Laurinburg Project." Doc. 37-32 at ¶ 22; Doc. 37-54 at ¶ 22. Mr. Melton thus led the Walkers to expect profits solely from the efforts of the defendants. This is an investment contract.

The defendants contend that the Walkers did not receive a security because the defendants did not provide them with a note. Doc. 41 at 14; *see also* Doc. 37-32 at ¶ 24; Doc. 37-54 at ¶ 24. But the *Howey* factors do not restrict securities to written instruments. *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) (noting that *Howey* "uses the terms 'contract, transition, or scheme,' leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general 'scheme' of profit seeking activities" (cleaned up)); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 193 (S.D.N.Y. 2023). If ever there was a scheme for profits, this was one; the defendants received money from the Walkers as an investment in the Laurinburg Project, from which the Walkers expected to profit.

The defendants also seem to contend that these payments were not securities because they were loans. Doc. 41 at 5–6, 13–14; Doc. 37-91 at 36, 43. But courts do not rely on "the names that may have been employed by the parties" to identify a particular investment. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851–52 (1975); *see also SEC v. Zada*, 787 F.3d 375, 381 (6th Cir. 2015) (holding that loans and investment contracts are not mutually exclusive); *SEC v. Edwards*, 540 U.S. 389, 397 (2004) ("[A]n investment scheme promising a fixed rate of return can be an 'investment contract.'"). Here, the evidence is undisputed that the Walkers expected to be repaid with profits from the Laurinburg Project. Doc. 37-32 at ¶ 21; Doc. 37-54 at ¶ 21. The evidence establishes that the transaction with the Walkers involved investment contracts and thus securities.

### b. Ms. Bates

Ms. Bates provided money to the defendants nine times between July 2016 and July 2019 for the Laurinburg Project. Doc. 37-77 at 2; Doc. 37-91 at 36, 41. There is a reasonable inference that she provided the funds with an expectation of profit from the Laurinburg Project, *see* Doc. 37-91 at 36, 41, particularly when considering Ms. Bates' payments in the context of the overall scheme. The defendants point to no evidence to dispute this. Because the SEC has shown a reasonable inference that Ms. Bates invested her funds in a common enterprise with the expectation of profits solely from the defendants' efforts, the SEC has shown that this was a security.

The defendants contend that because they did not provide Ms. Bates with an instrumentality, *see* Doc. 37-91 at 53, the SEC has not shown that she received a security.

24

Doc. 41 at 14. But as stated *supra*, the *Howey* factors do not restrict securities to written instruments. *Hocking*, 885 F.2d at 1457.

### c. Membership Unit Purchases – Ms. Sisley and Mr. Flanders

Around February 2017, Mr. Melton credited Ms. Sisley an ownership interest in the Laurinburg Project to recoup her losses from a previous deal with Mr. Melton. Doc. 37-3 at ¶¶ 14–15. He did this by selling her five membership units in Laurinburg Partners with a purported value of $100,000 for $23,500. *Id.* In December 2017, Mr. Flanders invested $53,000 in the Laurinburg Project in exchange for two membership units with a purported value of $60,000. Doc. 37-19 at ¶¶ 12–13. Mr. Melton had previously owned the membership units he sold to Mr. Flanders and Ms. Sisley. Doc. 37-91 at 44; Doc. 37-99 at 75. Mr. Melton told them both "that he would handle everything associated with the Laurinburg Project." Doc. 37-3 at ¶ 17; Doc. 37-19 at ¶ 8.

According to Laurinburg Partners' operating agreement, members would share in the profits based on their proportional ownership in the company. Doc. 37-4 at p. 7 ¶ 1.1.21. Mr. Melton also told Mr. Flanders that Mr. Flanders "would receive monthly checks for the returns on [his] investment in the Laurinburg Project after the first year," and that it would be "easy money." Doc. 37-19 at ¶ 9. The evidence shows that Ms. Sisley and Mr. Flanders expected to receive profits from the purchase of these membership units and, thus, that they were investment contracts.

The defendants contend that these membership units were not securities because Mr. Flanders and Ms. Sisley had an equal opportunity to participate in the decision-making for the Laurinburg Project. Doc. 41 at 13. But this contention is refuted by the

25

undisputed evidence. The operating agreement states that members "shall not be entitled to participate in the day-to-day affairs and management of the Company," Doc. 37-4 at p. 11 ¶ 4.1, and "the Manager, acting alone, shall have full, complete and exclusive authority . . . to manage and control the business of the Company." *Id.* at p. 12 ¶ 6.1. Mr. Melton, through ICM, retained control of the LLC as manager. *Id.* at p. 6 ¶ 1.1.14, p. 34. There is no evidence that either Mr. Flanders or Ms. Sisley participated in the business at all or that they had any expectation or right to so participate; all of the evidence is that they expected Mr. Melton to run the business and make the money.

The membership units the defendants sold to Mr. Flanders and Ms. Sisley are investment contracts and are thus securities.

### 2. Promissory Notes

"[T]here is a presumption that every note is a security." *United States v. Peters*, No. 19-4718, 2021 WL 4099907, at *3 (4th Cir. Sept. 9, 2021) (cleaned up) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990)). A party can overcome this presumption by meeting "either step of a two-tiered analysis." *Carlucci v. Han*, 886 F. Supp. 2d 497, 513 (E.D. Va. 2012). Courts begin by applying the "family resemblance" test to determine whether the promissory notes are similar to any non-securities. *Reves*, 494 U.S. at 64–65. Courts examine four factors: (1) "the motivations that would prompt a reasonable seller and buyer to enter into" the transaction, (2) "the plan of distribution of the instrument," (3) "the reasonable expectations of the investing public," and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts

unnecessary." *Id.* at 66–67 (cleaned up). Failure to show one of these factors is not dispositive. *SEC v. Thompson*, 732 F.3d 1151, 1160 (10th Cir. 2013). If none of the "family resemblance" categories apply, a party can overcome the presumption by showing that a new category should be added to the list. *Reves*, 494 U.S. at 67.

The SEC contends that the promissory notes that the defendants provided to Mr. Sisley and Mr. Tyson qualify as notes under 15 U.S.C. § 77b(a)(1) and 15 U.S.C. § 78c(a)(10) and thus are securities. Doc. 38 at 21.

### a. Mr. Tyson

On April 11, 2017, Mr. Melton provided Mr. Tyson with a $100,000 promissory note from Laurinburg Development Group, LLC, another Melton company. Doc. 37-26 at ¶ 14; Doc. 37-28. The note was issued "in furtherance of the redevelopment projects in Laurinburg." Doc. 37-26 at ¶ 14; Doc. 37-28 at ¶ 2. Mr. Melton agreed that this note would compensate Mr. Tyson for funds he lost in a previous investment with Mr. Melton. Doc. 37-26 at ¶ 14. The note stated that Mr. Tyson would be repaid with 20% interest at phase 2 of the project. *Id.*; Doc. 37-28 at 2. Later, Mr. Tyson provided Mr. Melton with an additional $150,000 for the Laurinburg Project in exchange for two promissory notes dated May 22, 2017; one was for $100,000, and the other was for $50,000. Doc. 37-26 at ¶ 15; Docs. 37-29, 37-30. Both notes stated that the defendants would pay Mr. Tyson back with 25% interest "upon entrance into phase 2 of the project." Doc. 37-26 at ¶ 15; Doc. 37-29 at 2; Doc. 37-30 at 2.

The promissory notes are securities, and the defendants have not provided evidence to rebut such a presumption. Mr. Tyson was motivated to make a profit through

the interest he earned on the notes, *see* Doc. 37-26 at ¶¶ 14–15, and the defendants were motivated to collect funds purportedly for the Laurinburg Project. *See, e.g.*, Doc. 37-28 at ¶ 2. The notes established that Mr. Tyson would receive funds at a later stage of the project. *Id.* at ¶ 1; Doc. 37-29 at ¶ 1; Doc. 37-30 at ¶ 1. The public would have viewed these notes as securities; the defendants did not make them widely available, but they did provide similar promissory notes to others who provided money for the project. *See, e.g.*, Doc. 37-17. The defendants have pointed to no other regulatory scheme for this type of instrument that would significantly reduce the risk of such a note and render the application of securities law unnecessary. *See Reves*, 494 U.S. at 67.

The defendants assert that one of the notes to Mr. Tyson fails the "family resemblance test" because it bore no interest except upon default. Doc. 41 at 15; *see* Doc. 37-26 at ¶¶ 23–24 (discussing 2021 note for $355,000). But the SEC does not contend this note is an investment, Doc. 42 at 12, and it is undisputed that the three notes the defendants sold to Mr. Tyson in 2017 did include interest. Docs. 37-28, 37-29, 37-30. Those three promissory are securities.

### b. Fred Sisley

The SEC has provided undisputed evidence that the note to Mr. Sisley, Doc. 37-17, is a security. *See* Doc. 37-11 at ¶ 16. The defendants do not disagree. *See* Doc. 41 at 13–15. Mr. Sisley's promissory note is a security.

### E. Summary and Conclusion as to Liability

As to all Counts, the SEC is entitled to summary judgment on liability. The uncontradicted evidence establishes that the defendants made material misrepresentations

28

or omissions to the Sisleys, the Walkers, Ms. Bates, Mr. Tyson, and Mr. Flanders with scienter, and that they did so in connection with the sale of securities. The defendants' arguments in their briefs are insufficient to overcome the SEC's evidence.

## V.     Statute of Limitations

The defendants have raised issues about the statute of limitations. It seems likely that this will affect the extent to which the SEC can seek penalties as to all counts and disgorgement as to Count II. But the SEC has moved for summary judgment as to liability only.

There is a five-year statute of limitations for civil penalties for all the claims. 28 U.S.C. § 2462. Because the SEC needed to show scienter for Counts I and III, there is a ten-year statute of limitations for disgorgement as to those counts; because the SEC did not need to show scienter for Count II, there is a five-year statute of limitations for disgorgement as to that count. 15 U.S.C. § 78u(d)(8)(A). There is a ten-year statute of limitations for equitable relief such as injunctions for all the claims. 15 U.S.C. § 78u(d)(8)(B).

The defendants first contend that under 28 U.S.C. § 1658(b), the statute of limitations for Count III is the earlier of (1) two years after discovery of the facts constituting the violation or (2) five years after the violation. Doc. 43 at 4. But § 1658 only applies to private causes of action. *Merck & Co. v. Reynolds*, 559 U.S. 633, 638 (2010) (quoting 28 U.S.C. § 1658(b)); *see also Gabelli v. S.E.C.*, 568 U.S. 442, 454 (2013) (refusing to apply a discovery rule to action brought by the SEC). The defendants cite no legal authority to the contrary. *See* Doc. 41 at 16–19; Doc. 43.

All conduct at issue occurred within 10 years of the filing of this lawsuit, so disgorgement and injunctive relief are available. Some conduct occurred more than five years before suit was filed, so civil penalties will be limited. No party has disputed when the defendants made the misrepresentations and when the investors transferred money or other things of value; to the extent the parties disagree about what events start the clock on the statute of limitations, those are legal questions the Court can decide as part of resolving any claim for penalties or disgorgement.

## VI. Remedies

The SEC only seeks summary judgment on liability. Doc. 37 at 2. The SEC asserts that it will move for remedies in a subsequent motion. *Id.*

## VII. Conclusion

The SEC met its initial burden of showing that there is no genuine dispute of material fact. The defendants did not come forward with evidence creating a genuine issue of material fact requiring a trial. The SEC is entitled to summary judgment as to liability on all three claims.

For the reasons stated herein, it is **ORDERED** that the plaintiff's motion for summary judgment, Doc. 37, is **GRANTED**.

This the 17th day of April, 2025.

_____
UNITED STATES DISTRICT JUDGE